WHALEY v. DUNCAN.

1. FINDINGS OF FACT by Circuit Judge sustained.
2. PRINCIPAL AND AGENT—EVIDENCE.—A principal who contends that his agent has acted outside of his instructions, must show it by the preponderance of the evidence.                                           ·
3. IBID.—A principal is bound by the acts of his agent in performing the work entrusted to him, unless he gave notice of special instructions, when such are given, to the party with whom the agent acted.
4. FINDING OF FACT of Circuit Judge sustained.

Before WATTS, J., Barnwell, August, 1895.    Affirmed.

Action in foreclosure by Whaley & Rivers against Willis J. Duncan and others.   The following is the decree of Judge Watts:                                    ·

The judgment in foreclosure in this case was set aside and vacated, and the cause recommitted to the master to take testimony whether the two mortgages (known as Bank of Barnwell mortgage and Bamberg mortgage), hereinbefore adjudged to be senior liens on the mortgaged premises, be liens at all, and if they be liens, what is their rank as to the mortgage of the defendant, Wheeler.   The master has taken and reported the testimony, and the cause now comes on to be heard by me upon the testimony so taken, the pleadings and proceedings in the cause.   I am satisfied from the testimony that there was a contract and agreement between Duncan, the debtor, and Whaley & Rivers, the creditors, consummated through A. T. Woodward, Esq., who was employed by the plaintiffs to settle up the business with Duncan, by which plaintiffs, Whaley & Rivers, were to pay off the three mortgages first, Bank of Barnwell, Bamberg and Wheeler mortgage, and receive in lieu thereof conveyances of the equity of redemption in the lands owned by Duncan and his mother, and certain other securities, and the mortgage on the stock of the said Duncan for $2,000.   These terms were complied with by Duncan, and Whaley & Rivers have received the benefit of it.   Whaley

& Rivers, instead of satisfying the mortgages as agreed, paid off the two first mortgages, and took assignments of them, and are now attempting to hold them as prior liens upon the premises to the exclusion of the mortgage to Wheeler, the payment of which was included in a part of the considertion of the agreement whereby they obtained the titles to the lands and securities as aforesaid.   I am, therefore, of opinion, and so hold, that the lien of the Wheeler mortgage is entitled to priority over the liens of the mortgages of the Bank of Barnwell and Bamberg, which are now held by the plaintiffs, Whaley & Rivers.

It is, therefore, adjudged, that the Wheeler mortgage is now the senior lien upon the premises described in the complaint, and as such, together with the costs and disbursements of said defendant, Wheeler, entitled to be first paid from the proceeds of the sale of the mortgaged premises.

It is further ordered, that the premises described in the complaint be sold by the master on salesday in October next, or some subsequent salesday thereafter, upon the terms provided in the decree heretofore mentioned in this case.   The only real parties in interest in this case are the plaintiffs and the defendant, Wheeler, the defendant, Duncan, having heretofore conveyed the title to the land to one Cannon, who holds for the benefit of the plaintiff; it is, therefore, immaterial what amounts, if any, are due under the two mortgages now held by the plaintiffs.   It is, therefore, adjudged, that the terms of the decree in foreclosure heretofore rendered in this case, except so far as the same may be inconsistent with this decree, and as amended by this decree, stand as the decree and judgment of the Court herein.

From this judgment and decree the plaintiffs appeal on the following grounds:

1. Because his Honor erred in not holding as a matter of law, that Duncan, in dealing with A. T. Woodward, the attorney at law of Whaley & Rivers, dealt at his peril in

all matters not within the scope of his position as legal adviser and counsellor, and when he acted as negotiator for the said Whaley & Rivers; and that the said Whaley & Rivers are in no way responsible for, nor are they bound by, any representations, contracts or agreements made by the said A. T. Woodward to and with the said Duncan, save only such as were authorized by the said Whaley & Rivers, and only within the specific terms of the authority given; and that if the said attorney at law, Woodward, exceeded the specific terms of authority and misled the said Duncan, there is nothing in the mere fact of his being an attorney at law of the said Whaley & Rivers which would justify the said Duncan in concluding that the said Woodward was conferred with the requisite power to make the alleged agreement whereby he was misled, the power to make such an agreement not being within the scope of his authority as attorney at law.

2. Because his Honor erred in not holding that, although Whaley & Rivers did authorize A. T. Woodward, their attorney at law, to make a settlement or compromise with Duncan of his indebtedness to them upon a certain basis, and accepted certain conveyances of the equity of redemption of lands over which they held mortgages, assignment of mortgages, and other securities as in carrying out such compromise, believing that the same were given by Duncan with like understanding; and although Duncan, on the contrary, gave said deeds and other securities for the purpose not of carrying out the offer of compromise as made by Whaley & Rivers, but the plan of settlement suggested by him to Woodward, and which plan the said Woodward had informed the said Duncan had been accepted by Whaley & Rivers, and did not advise Duncan of the modifications made therein by the said Whaley & Rivers as a condition precedent to its acceptance, nevertheless the said Duncan, having dealt with the said Woodward in a matter, a compromise, without the purview and scope of his authority as attorney at law at his peril, cannot hold the

said Whaley & Rivers responsible for the failure and neglect of their said attorney to obey their instructions to inform him of the modification of the proposition offered by him, upon which and only upon which would the same be agreed to.

3. Because his Honor erred in holding that A. T. Woodward was employed by Whaley & Rivers to settle up the business with Duncan, said finding being without testimony to support it; and he should have found that said A. T. Woodward was employed by Whaley & Rivers as their attorney at law, for the purpose of collecting the debt owed them by Duncan, by foreclosing the securities sent for said purpose, and that as a compromise of said indebtedness, they instructed their said attorney at law to settle same upon certain specified terms and conditions, beyond which their said attorney had no authority, and about which the party treating with the attorney treated at his own peril, and cannot hold Whaley & Rivers beyond the strict line of the instructions given by them.

4. Because his Honor erred in holding that there was a contract between Whaley & Rivers and Duncan, by which Whaley & Rivers were to pay off the three mortgages, Bank of Barnwell, Bamberg, and Wheeler mortgages, and receive in lieu thereof conveyances of lands, a mortgage of stock, and other securities. That Duncan has complied, and Whaley & Rivers have received the benefit of it; whereas he should have held that Woodward, as attorney at law, had no authority to make such arrangement without the consent of clients, and there being no consent, proved that the same is void; that, inasmuch as Whaley & Rivers have received the benefit, if benefit there be, innocently believing the transfer in furtherance of the compromise offered by them, they are not within the law, providing that where a party has received the benefit of a transaction, he cannot repudiate same when it comes to his turn to perform his part thereof; that Duncan has not complied with the terms of his own proposition, having himself testified that Whaley

& Rivers have not received deeds to the Sontag or Sweet Water place, nor the $2,000 for the stock, and that, therefore, having failed in the performance of his part of the contract, cannot compel full performance on the part of Whaley & Rivers.

5. Because his Honor erred in not holding that there was no consideration moving to the said Whaley & Rivers to make the contract alleged to have been made with Duncan, and that, therefore, said contract is null and void.

6. Because his Honor erred in not holding that there is no mutuality or privity of contract between the defendants, Wheeler and Duncan, and the plaintiffs, Whaley & Rivers, in the alleged agreement between Duncan and Woodward.

7. Because his Honor erred in holding that the lien of the Wheeler mortgage was entitled to priority over the liens of the mortgages known as the Bamberg, and Bank of Barnwell mortgages.

8. Because his Honor erred in holding that the Wheeler mortgage is now the senior lien upon the premises described in the complaint; whereas he should have held, if it be true that Whaley & Rivers have not carried out their part of the contract, that the said Whaley & Rivers be compelled to perform the same, or that the deeds and other transfers made by Duncan to Whaley & Rivers be declared null and void, and stricken from the record.

9. Because his Honor erred in not holding that an attorney at law has no right, as such, to change, in compromise of claim or debt, the securities sent by his client to him for foreclosure.

*Messrs. Buist & Buist* and *M. Rutledge Rivers*, for appellant, cite: 1 Par. on Con., 43; 1 Wait's A. & Def., 233, 430, 436; 1 Hill, 185; 1 Bail., 439; 12 S. C., 509; 39 A. R. P., 357, and note, 359, 360; 34 N. E. R., 261; 39 S. C., 490; 40 S. C., 114; 41 Am. Rep., 847, 848, 849; 19 S. E. R., 292; 22 S. E. R. Y., 365; 8 A. & E. Ency., 908; 13 S. C., 189; 2 Par. on Con., 528, 529; 121 Mass., 106; 1 Meb., 276; 12

John. (N. Y.), 426; 45 N. Y., 58;· 13 Pac. R., 398; 25 R., 6; 6 Wait's, 182; 85 Pa. St., 303; 67 Cal., 293; 12 Ore., 503.

*Messrs. Allen J. Green, Halcott P. Green,* and *John T. Sloan,* contra, cite: 24 S. E. R., 290; 13 S. C., 16; 27 S. C., 134; 39 S. C., 375; 1 A. & E. Ency., 341; 108 Pa. St., 1; 110 Ill., 35.

July 15, 1896. The opinion of the Court was delivered by

MR. CHIEF JUSTICE MCIVER. Inasmuch as we think it due to all parties that the decree of his Honor, Judge Watts, which is set out in the "Case," together with exceptions thereto, for the purposes of this appeal, should·be incorporated in the report of this case, a very brief statement of the transaction out of which this controversy arose, will be sufficient here. It appears that W. J. Duncan, being indebted to the plaintiffs, his factors, in a very considerable sum of money, had given to them certain mortgages on his own property, and also mortgages of his mother on her own property, to secure the payment of such indebtedness, and had also transferred to the plaintiffs as collateral security, certain mortgages held by said Duncan upon the property of other persons. Amongst these mortgages were the following: one held by the Bank of Barnwell on the O'Bannon place, being the first lien on that property; another held by F. M. Bamberg, being the second lien on that place; another held by W. G. Wheeler, being the third lien on the O'Bannon place; and the mortgage to the plaintiff being the fourth lien on that place. The mortgage debts secured by the three first named mortgages amounted without interest to the sum of $3,990, while the fourth mortgage to the plaintiffs was for the sum of $10,000. Some time in the latter part of the year 1892, A. T. Woodward, Esq., an attorney at law practicing in Barnwell County, where the mortgaged lands were situate, and where Duncan resided, was employed by the plaintiffs to effect a settlement or arrangement of the indebtedness of Duncan to the plaintiffs. Accordingly, on the 21st of December, 1892, Woodward wrote a letter to the·

plaintiffs, a copy of which is set out in the "Case," communicating the terms of the settlement which Duncan proposed to make, to which letter no reply was produced in evidence. Subsequently thereto a settlement was made between Duncan and Woodward, acting for plaintiffs; and the plaintiffs having paid to the holders of the mortgage to the Bank of Barnwell and of the mortgage to Bamberg the amounts due on their mortgages, and taken assignments thereof, are now seeking to enforce such mortgages as liens upon the O'Bannon place prior to the lien of the Wheeler mortgage, upon which nothing has been paid. So that the real controversy now is whether the Bank of Barnwell mortgage and the Bamberg mortgage should not be regarded as paid and satisfied, under the terms of the arrangement between Duncan and Woodward, acting as the agent of the plaintiffs, thus leaving the Wheeler mortgage the first lien upon the property. This depends upon two inquiries: First, what were the terms of the arrangement as actually made by Woodward and Duncan, which is a pure question of fact. Second, whether Woodward was legally authorized to make such arrangement, which may be regarded as partly a question of fact and partly a question of law.

As to the first of these questions, the undisputed testimony not only of Duncan himself but that of Buckingham, the cashier of the Citizens' Savings Bank, who was present at the settlement, leaves no doubt of the fact that the arrangement actually made was that the plaintiffs were *to pay and satisfy* not only the mortgages to the Bank of Barnwell and Bamberg, but also the mortgage to Wheeler. So that there was clearly no error on the part of the Circuit Judge in so finding.

As to the second question, the testimony leaves in some doubt what were the instructions given by plaintiffs to Woodward. There is no doubt, as it seems to us, that Woodward was not acting merely as attorney at law in the ordinary course of such business in collecting a claim, as seems to be contended for in the argument for appellants,

for Mr. Rivers, who was the managing partner of the plaintiffs, as he says, testifies, in answer to a question, for what purpose he sent a certain mortgage to Woodward: "I sent to him with the other mortgages and papers in the Duncan matter to enable him, Woodward, to effect a settlement with Duncan as outlined in his (Woodward's) letter of the 21st December, 1892;" and that letter, which is set out in the "Case," shows very clearly that the idea was to invest Woodward with much more and different authority from that ordinarily incident to the duty and authority of an attorney at law to whom a claim is sent for collection in the ordinary course of such business. Indeed, the testimony of Mr. Rivers, throughout, shows that the intention of the plaintiffs was to invest Woodward with more authority than is ordinarily incident to the office of a mere attorney at law; for his complaint is *not* that Woodward had no authority to make *any* arrangement or settlement with Duncan, "as outlined" in Woodward's letter, above referred to, but that he had exceeded or departed from the instructions given as to the details of such settlement. Now, what such instructions were, presents a question of fact, upon which the burden of proof would rest upon the plaintiffs; and we must say that we are not satisfied that such burden has been met. We have before us the letter of Woodward, stating the terms which Duncan proposed, one of which was that the plaintiffs should pay up all the three mortgages prior to plaintiffs', thus leaving theirs as the first mortgage on the O'Bannon place, and to this letter no reply is produced, though one was asked for; and yet the testimony of Mr. Rivers indicates that such letter was replied to promptly. On the contrary, plaintiffs, for the purpose of showing that the terms proposed by Duncan and communicated to them by Woodward's letter were modified, rely solely upon the parol testimony of Mr. Rivers, which was objected to, doubtless, upon the ground that it did not afford the best testimony; for, as the plaintiffs resided and did business in the city of Charleston, and

Woodward resided and did business in Barnwell, there is every probability confirming the impression of Mr. Rivers, that any instructions given by plaintiffs to Woodward, modifying the terms proposed by Duncan, must have been communicated by letter, a copy of which Rivers seems to think the plaintiffs have, and could have introduced, after notice and failure to produce the original. While, therefore, we cannot doubt, in view of the testimony of Mr. Rivers, that the plaintiffs honestly believed that they had given instructions to their agent, Woodward, to modify the terms proposed by Duncan in certain particulars, yet we are bound to say that this has not been established by such evidence as the law requires in such cases.

But even if we are in error in this, and even if we assume that Woodward did exceed or depart from the instructions given him by the plaintiffs as to the details of the settlement which he was unquestionably authorized to make, we still think the plaintiffs, notwithstanding such private instructions, which it is not pretended were made known to Duncan, would still be bound by the act of their agent, if such act was within the scope of his agency. Now the scope of Woodward's agency was to make some such settlement as that "outlined" in Woodward's letter; and if, in making such settlement, he departed from the instructions of his principals, in regard to some of the details of the settlement, the principals would still be bound, unless it was made to appear that Duncan was informed of such instructions. It seems to us that the case of *Reynolds* v. *Witte*, 13 S. C., 5, is conclusive upon this point. In that case, the plaintiff, through his agent, loaned money to the defendant, and to secure the payment of such loan, deposited with the agent certain city bonds as collateral security. The agent fraudulently appropriated these bonds to his own use; and the question was, whether the principal was responsible for this fraudulent act of the agent? The Court held that a principal is responsible for any fraudulent act of his agent, where such act is done in

the course of his agency, and by virtue of his authority as agent. As was said in that case: "What is the proper understanding of the phrase, 'within the scope of the agency?' Does the 'scope' include negligence and exclude fraud? It cannot properly be restricted to what the parties intended in the creation of the agency, for that would also exclude negligence, as no agent is appointed for the purpose of being negligent, any more than for the purpose of acting fraudulently. The question cannot be determined by the authority intended to be conferred by the principal. We must distinguish between the authority to commit a fraudulent act and the authority to transact the business in the course of which the fraudulent act was committed." In that case, the following passage is quoted with approval from Story on Agency, sec. 452, which is quite appropriate to the present case: "It is a general doctrine of law that, although the principal is not ordinarily liable (for he sometimes is), in a criminal suit, for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in them, yet he is held liable to third persons in a civil suit, for the frauds, deceits, concealments, misrepresentations, negligences, and other malfeasances, misfeasances, and omissions of duty of his agent, *in the course of his employment*, although the principal did not authorize or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them. In all such cases, the rule applies *respondent superior*, and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealings either directly with the principal or indirectly with him, through the instrumentality of agents. In every such case, the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of his agency." In *Mars v. Mars*, 27 S. C., at page 134, it was said: "There are two classes of agents, general and special, and their powers, when properly analyzed, are governed by the same general prin-

ciple, to wit: they can do anything within the scope of their agency so as to bind their principal, notwithstanding there may be some secret instructions limiting their powers." So that we do not think there was any error on the part of the Circuit Judge in holding the plaintiffs were bound by the arrangement between Duncan and Woodward, acting as the agent of the plaintiffs, whereby the plaintiffs were bound to pay and satisfy all of the three mortgages on the O'Bannon place; and as a consequence, that the mortgages of the Bank of Barnwell and Bamberg must be regarded as paid and satisfied, notwithstanding the fact that the plaintiff took a formal assignment thereof—and this would leave the Wheeler mortgage as the first lien on the O'Bannon place.

We do not think that the fourth exception, wherein error is imputed to the Circuit Judge in finding that Duncan had complied with the arrangement, can be sustained.

4 As we understand the testimony of both Duncan and Buckingham as to the terms of the arrangement, Duncan was to give titles to the land covered by mortgages given by himself and his mother, and a bill of sale of the stock to secure the balance, $2,000, and all this was done. There was no agreement that titles to the lands owned by third persons, upon which Duncan held mortgages, should be made to the plaintiffs, nor that the $2,000 should be *paid;* and hence the failure of the plaintiffs to receive titles for the Sontag or Sweet Water place, and the failure to *pay* the $2,000 was no violation of the agreement. The fifth exception cannot be sustained, for there certainly was some consideration, whether sufficient or not, is not the question, for the agreement; for by that arrangement the plaintiffs received titles for the land instead of mere liens thereon, and would have obtained a first lien upon the O'Bannon place, if the plaintiffs had fulfilled their part of the arrangement made by their agent.

Under the view which we have taken we do not see the pertinency of the point raised by the sixth exception, and

hence it cannot be sustained. The effort here is not to enforce the specific performance of the agreement entered into by Duncan with Woodward, acting as agent of the plaintiffs, but the question here presented is as to the effect of one of the terms of the arrangement upon the rights of the holder of the Wheeler mortgage. If, as we have seen, the effect of that arrangement was to satisfy the Bank of Barnwell mortgage and the Bamberg mortgage, the necessary result would be to leave the Wheeler mortgage the first lien on the O'Bannon place.

The judgment of this Court is, that the judgment of the Circuit Court be affirmed.